IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARVIN MENIFEE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 09-104 |
| | ) | |
| v. | ) | Judge Fischer |
| | ) | Magistrate Judge Bissoon |
| CATHERINE C. McVEY, in her official capacity as Chairman of the Pennsylvania Board of Probation and Parole, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

# **ORDER**

On February 10, 2009, the preliminary injunction hearing scheduled in this case was cancelled because the Court "ha[d] identified substantial issues of law that . . . should be resolved" in advance of the hearing. *See* Order (Doc. 20) at 1-2. The same day, consistent with the District Court's instruction (*see* Doc. 7), Defendant the Pennsylvania Board of Probation and Parole (at times, "the Board" or "the State Board") filed a Motion to Dismiss. *See* Def.'s Mot. to Dismiss (Doc. 21).

Defendant's Motion addresses some of the same issues that gave the Court pause in proceeding immediately with the preliminary injunction hearing. Most salient is Defendant's assertion that Plaintiffs have sued the wrong party or, alternatively, that they have failed to join necessary and/or indispensible parties. *Compare* Def.'s Br. in Opp'n to TRO (Doc. 9) at 3 ("Plaintiff[s] seek to enjoin the Board and require it to take action that is [exclusively] within the [power] of the sentencing court") *with* Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 22, hereinafter "Def.'s Br.") at 20 (arguing that, "[s]hould the Court [reject the Board's arguments

regarding] abstention . . ., it will be necessary to address whether plaintiffs have named the proper defendants").

While Defendant's Motion also presents arguments regarding venue, *Younger* and *Pullman* abstention, and the failure to exhaust administrative remedies, Plaintiffs' pleadings and moving papers most readily beg the question of whether their claims properly may be remedied through suit against this Defendant, or at least this Defendant alone. Although the inquiry may be viewed through different lenses, the challenges in question often arise within the context of "redressability," as required for the purposes of Article III standing. *See generally* Anthony v. Council, 316 F.3d 412, 416 (3d Cir. 2003) (citation omitted).

Much like subject matter jurisdiction, Article III standing is a threshold inquiry that federal courts are "under an independent obligation to examine." *Id.* (citation and internal quotations omitted). It follows that the Court may move this issue to the fore. *See id.* (addressing standing "[b]efore turning to the merits of abstention"); *see also generally* Wilbur v. Locke, 423 F.3d 1101, 1106 (9th Cir. 2005) ("[i]It is hardly novel for a federal court to choose among threshold grounds," including Article III standing, "for denying audience to a case on the merits").

Whether framed in terms of standing or otherwise, the Court believes that this case cannot appropriately proceed until the above issues are resolved.

**BACKGROUND**

Plaintiffs are three individuals who were charged with crimes in the Court of Common Pleas of Allegheny County. *See generally* Compl. (Doc. 1) at ¶¶ 19, 31, 38. Although sentenced by the Court of Common Pleas, Plaintiffs were placed on "special probation," subject to the supervision of the State Board. *See id.* at ¶¶ 10-12. Special probation is targeted at "more

2

serious offender[s]" than those typically monitored by local supervisory agencies, and it is effectuated when "any judge of a court having criminal jurisdiction" in Pennsylvania "by special order direct[s] supervision by the [State B]oard." *See* Com. v. Mitchell, 955 A.2d 433, 439 (Pa. Super. 2008) (citations and internal quotations omitted); *see also* 61 Pa. Cons. Stat. § 331.17a (statutory authority for special probation).

The Board's function regarding special probationers is supervisory, and it "does not have the power to grant[ or] establish the terms of or [to] revoke probation." Compl. at ¶ 9; Mitchell, 955 A.2d at 441 ("Section 331.17a [does] not give the Board jurisdiction or power to determine if [a probationer] ha[s] violated his probation, to revoke his special probation, or to re-sentence [him] following revocation of his special probation") (citations omitted). Rather, "the trial court retain[s] the power, authority, [and] jurisdiction to determine whether [a probationer] violated his special probation, to revoke it, and to re-sentence." Mitchell, at 441 (emphasis added).

Plaintiffs claim that, despite Defendant's inability to determine by force of law that any probationer has violated his conditions of special probation, Defendant acted unconstitutionally by arresting and detaining Plaintiffs without ensuring that they received prompt "notice and a preliminary hearing [incident to their] arrest and detention" for potential probation violations. *See* Pls.' Mot. for TRO (Doc. 2) at ¶ 3. Although Plaintiffs admit that Defendant is without authority to conduct an initial probable cause (or *Gagnon I*) hearing,[1] they nevertheless seek injunctive relief compelling Defendant to promptly secure notice and a *Gagnon I* hearing before the sentencing judge. *See, e.g.*, Pls.' proposed order of court on TRO (filed under Doc. 2-2) at 2;

---

[1] In Gagnon v. Scarpelli, "the United States Supreme Court held that due process requires that a probationer . . . be given a preliminary (*Gagnon I*) and a final (*Gagnon II*) hearing prior to revoking probation." Jacobs v. Pennsylvania Bd. of Probation & Parole, 958 A.2d 1110, 1115 & n.3 (Pa. Commw. 2008) (citations and internal quotations omitted). The *Gagnon I* hearing "ensure[s] against detention on allegations of violations that have no foundation of probable cause." *Id.* at 1115 (citation and internal quotations omitted).

*see also id.* ("Defendant shall provide . . . notice within two (2) days of this order <u>and shall schedule the [*Gagnon I*] hearing by the sentencing court promptly thereafter</u>") (emphasis added).

As referenced above, Plaintiffs seem well aware that Defendant lacks the power to compel the relief requested, *i.e.*, timely notice and provision of a *Gagnon I* hearing.[2] *See* Pls.' Br. in Supp. of TRO (Doc. 11) at 6 (arguing that Pennsylvania's statutes, Rules of Criminal Procedure, and Administrative Code have no procedures compelling timely *Gagnon I* hearings).[3] The Pennsylvania Administrative Code, as referenced in Plaintiffs' brief, delineates the scope of the Board's actual authority:

> The Board may, during the [special] probation . . . period, in case of violation of the conditions of probation . . ., detain the special probationer or parolee in a county prison and <u>make a recommendation to the court</u>, which may result in the revocation of probation . . . and commitment to a penal or correctional institution to serve a sentence . . . .

37 Pa. Code § 65.3 (emphasis added).

---

[2] Contrary to Defendant's suggestion, Plaintiffs do not request in their pleadings or Motion for injunctive relief an immediate release from custody; rather, they seek only a properly noticed *Gagnon I* hearing. *Compare* Def.'s Br. at 17 ("[w]hile [P]laintiffs may couch their claims in terms of untimely hearings or lack of notice, there is no doubt that what they really seek is release from custody") *with* Compl. at Wherefore clause, ¶ c; Am. Compl. (Doc. 13) at Wherefore clause, ¶ d; *and* Pls.' Mot. for TRO at Wherefore clause (each requesting that Defendant be enjoined from denying Plaintiffs *Gagnon I* hearings).

[3] The Court cannot agree with Plaintiffs' counsel that Pennsylvania law does not require a timely *Gagnon I* hearing. In <u>Com. v. Ferguson</u>, 761 A.2d 613 (Pa. Super. 2000), the court held that although "no statute, court rule, or case specifically outlin[ed] the timing requirements for *Gagnon I* revocation hearings where the court of common pleas has jurisdiction," the predecessor to Criminal Rule 708, Rule 1409, "appl[ied] to the *Gagnon I* hearing" and required that "a hearing [be] held as speedily as possible." <u>Ferguson</u> at 618-19. Although Plaintiffs' counsel highlights that the Rule now in effect, Rule 708, states in its comment section that it "addresses *Gagnon II* revocation hearings only," the same comment appeared in the final version of its predecessor, Rule 1409. *See* Pa. R. Crim. P. 1409 at cmt. The comment notwithstanding, the <u>Ferguson</u> Court held that "the 'reasonable time' standard applicable to a . . . *Gagnon II* hearing . . . likewise appl[ies] to the *Gagnon I* hearing." *Id.* at 619.

The limited scope of the Board's involvement is further reflected in the stipulated Order of the parties, entered in resolution of Plaintiffs' Motion for a TRO:

> Defendant shall immediately <u>request</u>, <u>through the [Allegheny County] Court Liaison established for that purpose</u>, <u>that the sentencing court(s) schedule a</u> . . . *Gagnon I* . . . <u>hearing</u> to determine whether there is probable cause to believe that a violation of a condition of probation imposed by the sentencing court has occurred and that continued detention pending a full hearing is warranted. Defendant ha[s] provided this Court with confirmation the *Gagnon I* hearings <u>were requested</u> in the form of the attached facsimiles. Defendant shall provide confirmation to Plaintiffs' Counsel <u>as soon as the hearings are scheduled [by the trial court]</u> . . . .

*See* Order dated Feb. 3, 2009 (Doc. 17) at 1 (emphasis added).

## **ANALYSIS**

As discussed above, the Board's capacity to affect the invocation of *Gagnon I* rights is limited to "request[ing]" that the Court of Common Pleas hold a preliminary hearing and making "recommendations" regarding the disposition of an alleged probation violation. Defendant first highlighted its inability to provide the relief requested in its opposition to Plaintiffs' request for a TRO. *See* Defs.' Opp'n Br. at 2-3. While Plaintiffs admittedly have not enjoyed a full opportunity to address the issue, their response to this point has been unsatisfying:

> Defendant suggest[s] . . . that Plaintiffs have not [shown] . . . Article III [standing] because the injury to special probationers from incarceration without notice or a *Gagnon I* [hearing] is traceable to parties not before this Court, namely the criminal judges of the Pennsylvania Courts of Common Pleas. . . .
>
> Although Plaintiffs could sue all of the [C]ommon [P]leas [C]ourt judges with criminal jurisdiction in Pennsylvania[] . . . as the vehicle to enforce their procedural due process rights . . ., this is not necessary. The [District] Court's "function . . . is not to determine the most suitable defendants but to decide whether the complaint has named defendants who meet the prerequisites to

5

> adjudication in a federal court." Finberg v. Sullivan, 634 F.2d 50, 53 (3d Cir. 1980).

Pls.' Br. in Supp. of TRO at 7-8 (quotations in original).

The Finberg decision is far less helpful to Plaintiffs than their counsel suggests. In that case, a creditor sought to execute on a default judgment taken against the plaintiff by garnishing her sole source of income, social security retirement benefits, through filing a writ of execution with the prothonotary of Philadelphia County. *Id.* at 51-52. The prothonotary issued the writ, and it was served on the plaintiff's bank by the county sheriff, thereby enjoining the bank from releasing money from the plaintiff's account. *Id.* at 52. The money, however, was "entirely exempt from attachment and garnishment" under the Social Security Act, and it also was eligible for exemption from debt collection under Pennsylvania statute. *Id.* After five months of state court litigation, the plaintiff's bank released the funds. *Id.*

Meanwhile, the plaintiff brought federal suit challenging the constitutionality of Pennsylvania's postjudgment garnishment procedures, naming as defendants the county prothonotary and sheriff. The defendants argued that the plaintiff had sued the wrong entities, and the Third Circuit Court opined:

> Our function, of course, is not to determine the most suitable defendants but to decide whether the complaint has named defendants who meet the prerequisites to adjudication in a federal court. . . . [T]he Supreme Court [has] held that a particular official [is] properly named as a defendant if the official by virtue of his office has some connection with the enforcement of the act. . . .
>
> Ex Parte Young[, 209 U.S. 123 (1908)] . . . explained the nature of the necessary connection. The state official [named there] was the attorney general, and he had a sufficient connection with the enforcement of the challenged law, which set maximum rates for railroads, in his responsibility for bringing civil enforcement actions against violators. . . . The [Supreme] Court reasoned that these responsibilities made him personally a party to the

6

> controversy over the law's enforcement because his bringing of a civil enforcement action against a violator would, if the rate law was unconstitutional, constitute an actionable wrong or trespass to the violator's legal rights. . . .
>
> [F]or contrast[,] an earlier case, Fitts v. McGhee, 172 U.S. 516 [(1899)] . . . did not allow a suit against state officials who had no responsibilities to take any personal actions to enforce or execute a law alleged to be unconstitutional and who consequently could commit no actionable wrong against the plaintiffs in connection with the law.

*Id.* at 53-54 (some citations and internal quotations omitted).

On the facts before it, the Finberg Court held:

> [T]he duties of the prothonotary and the sheriff in connection with the postjudgment garnishment procedures consist of issuing the writ of execution and serving it on the garnishee. . . . Their actions were the immediate causes of the attachment and freezing of [the plaintiff's] bank accounts. If the rules that they were executing are unconstitutional, their actions caused an injury to her legal rights. On the basis of the reasoning employed in Ex Parte Young, we find that they are parties to her dispute over the constitutionality of these rules and properly named as defendants . . . .

*Id.* at 54.

To the extent that reliance on Finberg is appropriate, the Third Circuit's reasoning poses the question of whether Plaintiffs' claims are more like those in Finberg, where the state officials were susceptible to suit, or more like those in Fitts, where they were not. In this Court's view, Fitts is more analogous.

Unlike the plaintiff in Finberg, the actions of Defendant here (*i.e.*, the alleged arrest and detention of Plaintiff) were not the "immediate causes" of the constitutional deprivation alleged (*i.e.*, the lack of a timely *Gagnon I* hearing). Plaintiff has not, and cannot, demonstrate that the statutory and/or administrative powers invoked by the Board proximately resulted in a

7

deprivation of their constitutional rights. Agents of the Court of Common Pleas, and those agents alone, possessed the legal authority to prevent Plaintiffs' alleged *Gagnon I* deprivations. Like the state officials in Fitts, Defendant "had no responsibility[y] to take . . . personal action[]" in effectuating Plaintiffs' *Gagnon I* rights, as it admittedly possessed no legal authority to compel the same. The Finberg Court's analyses regarding claims against the "right" or "wrong" defendants provide Plaintiffs no refuge in their attempts to seek redress through a party lacking the capacity to provide it.[4]

Not only does Finberg fail to support Plaintiffs' theory, it raises additional questions regarding necessary and/or indispensible parties. In concluding that other state officials were not "necessary," the Finberg Court stated:

> If . . . the prothonotary and the sheriff are properly named as defendants, the suggestion that other officials should have been named is significant only if these other officials are necessary [under] . . . Fed. R. Civ. P. 19(a). . . . The only other Pennsylvania officials who might be said to have an interest in this constitutional challenge to Pennsylvania's postjudgment garnishment rules are the officials who promulgated them, the justices of the Pennsylvania Supreme Court. We find that their joinder is not necessary, [because] . . . . [a] declaration that the prothonotary and the sheriff violated [the plaintiff's] constitutional rights would afford all of the relief that she sought at the beginning of this lawsuit: the undoing of the process that led to the attachment and freezing of her bank accounts. She requested no relief that required the involvement of the justices.

---

[4] The Finberg Court's analyses were raised within the context of Ex Parte Young, "the seminal decision" addressing an exception to the bar of the Eleventh Amendment where a "suit to restrain enforcement [of state law may] be characterized as a suit against the official personally and not as a suit against the state." *See* Finberg, 634 F.2d at 54. The issues in this case go more to whether Defendant can provide Plaintiffs the relief they request (*i.e.*, redressability). Whether viewed through the prism of Article III standing or Finberg, however, Plaintiffs' position is equally lacking.

*Id.* at 54-55.  In reaching this conclusion, the Finberg Court distinguished another Third Circuit decision holding that "[the] Supreme Court of Pennsylvania was a necessary and indispensable party to a suit challenging a denial of admission to the state bar because a Supreme Court ruling was necessary for [the plaintiff's] admission." *Id.* (citation omitted, emphasis added).

The distinctions between Finberg and the instant case are apparent on their face. In Finberg, a declaration to the defendants that the state laws they enforced were unconstitutional would prevent them from engaging in the aggrieved conduct, *i.e.*, issuing and serving writs of execution on social security proceeds.  The plaintiff's harm -- her inability to access social security funds -- thereby would be remedied.  In this case, on the other hand, Plaintiffs do not advance the proposition that a finding of unconstitutionality should result in their immediate release.  *See* discussion *supra*.  More importantly, the *Gagnon I* hearings they justifiably seek would require the involvement of the Allegheny County Court of Common Pleas, thereby supporting a finding of necessary and/or indispensible parties under Finberg.  *See* discussion *supra* (noting Third Circuit Court's holding that "[the] Supreme Court of Pennsylvania was a necessary and indispensable party" where its "ruling was necessary" to remedy alleged constitutional infirmity).

In sum, the only precedential decision cited by Plaintiffs regarding standing and necessary/indispensible parties does more to undermine their case than support it.

Finberg aside, the Court has serious doubts that Plaintiffs can establish the redressability requirement of Article III standing.  "[T]he party invoking federal jurisdiction bears the burden of establishing [the] elements" of Article III standing.  Lundy v. Hochberg, 2003 WL 22426920, *3 (3d Cir. Oct. 22, 2003) (citation to binding authority and internal quotations omitted). This includes a demonstration that it is "likely," as opposed to merely "speculative," that the

9

injury will be "redressed by a favorable decision." *Id.* at *2-3 (citation to quoted source omitted).

Even if the Court granted the injunctive relief requested, namely that Defendant must secure Plaintiffs a timely *Gagnon I* hearing before the trial court, the Board remains impotent to compel this result. Armed with an order of injunction from this Court, the Board's agents could "request" or "recommend" hearings until they were blue in the faces, but Defendant still would lack the legal authority to ensure compliance with the order. Under the circumstances, any suggestions of redressability would be left to speculation, wishful thinking, or both. *See* discussion *supra* (to establish redressability, remedy must be "likely," not speculative); *see also generally* 13A Fed. Prac. & Proc. Juris.3d § 3531.5 (2009) at text preceding n.75 (within context of Article III standing, "[a] common variety of the public-official defendant cases involves actions brought by mistake or miscalculation against an official who lacks authority to . . . accord [the] desired relief"; thus, where "[a state a]ttorney [g]eneral . . . had no direct enforcement authority," "his power to advise and direct the district attorneys who had enforcement authority did not establish that he could" redress plaintiff's injury) (emphasis added); *id.* at text preceding n.87 ("when the complaint is that the government has failed to act, identification of the proper defendant may ensnare a plaintiff in the internecine rivalries or buck-passing of separate government agencies"; "[t]he only safe course may be to join as many agencies as possible, lest a wrong choice defeat standing").[5]

---

[5] Although the Court's standing analysis has focused on redressability, the inquiry also may be framed within the context of causation. *See* Pichler v. UNITE, 542 F.3d 380, 390 (3d Cir. 2008) (Article III standing requires "a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of some third party not before the court") (citation to quoted source omitted, emphasis added). The distinction is immaterial for the purposes of the analyses above. *See generally* 13A Fed. Prac. & Proc. Juris.3d § 3531.5 at text preceding n.93 ("[t]he connection

10

As just seen, Plaintiffs' lawsuit raises vexing questions regarding Article III standing; whether they have sued the correct government official; and/or whether all necessary parties have been joined. And though Plaintiffs' counsel has considered the possibility of joining other actors, *see* discussion *supra* (contemplating suit against "all of the [C]ommon [P]leas [C]ourt judges" with criminal jurisdiction), they appear less than enthusiastic to do so. Even assuming Plaintiffs can navigate the issues above, they still face potentially thorny challenges under the doctrines of *Younger* and *Pullman* abstention, and the failure to exhaust administrative remedies.

Defendant, on the other hand, has demonstrated its capacity to utilize the limited mechanisms within its control when properly motivated. *See* discussion *supra* (quoting Order on TRO, under which Defendant agreed to "immediately request, through the [Allegheny County] Court Liaison established for that purpose, that the sentencing court(s) schedule" *Gagnon I* hearings); *cf. also generally* Def.'s Br. at 7-8 (quoting Board's "internal Policy and Procedure 6.5," which among other things contemplates probation agents "submitting an arrest report to the Court within 5 working days of the arrest," and "recommending that the [trial c]ourt schedule a *Gagnon I* hearing"). Although these avenues do not appear, from this Court's perspective, to compel relief as would be required under the "redressability" and/or Finberg standards, they may well have some practical effect on the system as it exists.[6]

For these reasons, the Court believes it in all of the parties' best interests to engage in court-supervised negotiations regarding an amicable resolution of this case. Should counsel be

---

[between causation and] remedial benefit often is very practical," because "if the injury is not caused by the challenged acts, an order directed to them will not redress it").

[6] Assuming that delays in the provision of *Gagnon I* hearings is in any way attributable to the Court of Common Pleas or its agents, a stipulated order in federal court may serve as a wake-up call to any responsible parties. Although this Court currently is in no position to discern the causes of Plaintiffs' apparent denial of timely *Gagnon I* hearings, it is hard to imagine that the state court system would condone the usurpation of deeply rooted constitutional rights.

able to fashion a consent order or decree, as they have done for the purposes of Plaintiffs' requested TRO, this may be sufficient to satisfy Plaintiff counsel's concerns moving forward. *Cf.* Pls.' Mot. for Class Certif. (Doc. 14) (seeking to obtain prospective relief on behalf of all special probationers "who have been or will be arrested and incarcerated without notice and [a] timely" *Gagnon I* hearing); *cf. also* Compl. at signature line (Plaintiffs are represented by "[the] Community Justice Project") *and* website at http://www.communityjusticeproject.org (Community Justice Project's mission is to "challenge[] policies and practices [that] cause hardship to [the indigent] throughout Pennsylvania").

Otherwise, the parties must be prepared to face protracted legal wrangling regarding standing, abstention, and related doctrines, which, if prevailed upon by Defendant, will likely result in request(s) for leave of amendment. Should this litigation proceed on its current course, moreover, the parties can expect extensive appellate review, irrespective of who prevails here. In the absence of an amicable resolution, a final adjudication of these issues may take years to winnow through the legal system, while the rights of untold special probationers are left hanging in the balance. *Cf.* Compl. at ¶ 3 (alleging that Plaintiff Richard Montgomery was detained without hearing for 26 days, Marvin Menifee for 87 days, and Darrell Keener for 217 days).

For all of the reasons stated above, counsel and persons with full settlement authority shall appear in the undersigned's Chambers on **March 5, 2009 at 2:15 p.m.** to discuss the potential amicable resolution of this case. Should such efforts prove unsuccessful, the Court will establish a deadline for Plaintiffs to respond to Defendant's pending Motion to Dismiss, as well as the issues addressed in this Order.

February 17, 2009				s/Cathy Bissoon
					Cathy Bissoon
					United States Magistrate Judge

cc (via email):

Kevin L. Quisenberry, Esq.
Kemal Alexander Mericli, Esq.
Mary Lynch Friedline, Esq.